IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISON

| | | |
|---|---|---|
| CALVIN HEMPHILL, #289249 | * | |
|     Plaintiff, | * | |
|   vs. | * | CIVIL NO. WDQ-08-408 |
| | * | |
| J. MICHAEL STOUFFER, et al. | * | |
|     Defendants. | * | |
| | *** | |

MEMORANDUM OPINION

Calvin Hemphill sued J. Michael Stouffer, the Commissioner of the Division of Correction ("DOC"), and others ("the Defendants") for violating his Fourteenth Amendment rights. Pending is the Defendants' supplemental motion to dismiss or for summary judgment.[1] No hearing is necessary. Local Rule 105.6 (D. Md. 2010). For the following reasons, the Defendants' motion will be granted.

I.  Background[2]

When he filed this action, Hemphill was an inmate at Northern Branch Correctional Institution ("NBCI"), a maximum security facility in Cumberland, Maryland. ECF No. 19 at ¶ 5. Previously, he was an inmate at the Maryland Correctional Institution ("MCIH") in Hagerstown, Maryland. *Id.* at ¶ 21.

On July 3, 2007, Hemphill was removed from MCIH's general population and placed on

---

[1] The Defendants' first motion to dismiss or for summary judgment and Hemphill's cross-motion for summary judgment were denied without prejudice on August 14, 2009. The case was stayed pending resolution of *Cabana v. Warden.* ECF No. 49. On March 30, 2010, the stay was lifted and the parties were granted additional time to file supplemental responsive pleadings. ECF No. 50. The Court has considered the pleadings.

[2] In reviewing the motion for summary judgment, Hemphill's evidence "is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

administrative segregation, without a hearing. *Id.* He was provided a notice of assignment, stating "reasons exist to believe that you are dangerous to the security of the institution and/or inmate and/or staff." ECF No. 29, Ex. 1 at 4-5. Prison officials believed that Hemphill was a leader for the Black Guerilla Family ("BGF") gang and involved with the Crips. *Id.* at 3, 7-8, & 45-47. Prison intelligence indicated that Hemphill had ordered hits on other inmates. *Id.* at 3. He had also been found guilty of six institutional infractions, including acts of violence and weapons possession. *Id.*

On July 6, 2007, Hemphill attended a case management review to discuss the basis for his placement on administrative segregation. He was allowed to challenge his assignment. *Id.* at 6 & 50-51. Because of his institutional infractions and gang affiliation, Hemphill was reclassified to maximum security and transferred to NBCI on August 2, 2007.

On August 09, 2007, Hemphill attended a case management review before NBCI's classification and levels committee[3] and was placed in the Special Management Unit ("SMU") and Quality of Life ("QOL") program.[4] Hemphill had his first Behavioral Management Plan ("BMP") meeting for the QOL program, was allowed to contest the basis for his placements, and was placed at the program's intake level. ECF No. 29, Ex. 2 at 17. Hemphill refused to sign his BMP and was told he would remain on the intake level until he did. *Id.*

QOL intake level inmates were allowed: (1) two showers per week, (2) one day of recreation

---

[3] The committee included a chief psychologist, psychology associate, social worker, case manager, intelligence officer, housing unit sergeants, a housing unit manager, a correctional officer, and the program historian. ECF No. 29, Ex. 3 at 11.

[4] QOL was a behavioral management program for inmates deemed a security threat. ECF No. 29, Ex. 3.

a week in a three-piece restraint, and (3) only legal and clergy visits. ECF No. 29, Ex. 3 at 7-8, & 20. They had restricted property privileges. *Id.* Inmates could not advance from the intake level until they agreed to participate in the program. *Id.* As initially implemented, QOL inmates who refused to participate in the program remained at the intake level indefinitely. *Id.*[5]

Hemphill remained at the intake level until December 2007, because he refused to participate in the program. ECF No. 29, Ex. 2 at 14-16. On December 27, 2007, Hemphill agreed to participate and advanced to level 1 of the program. *Id.* at 13. He was returned to the intake level when he displayed an "inappropriate attitude" and used inappropriate language towards NBCI staff. *Id.* at 12.[6]

On April 9, 2008, Hemphill asked to opt out of the QOL program. ECF No. 29, Ex. 2 at 9 & 18.[7.] On May 1, 2008, the classification and levels committee removed him from the program and he was placed on administrative segregation. *Id.* On January 22, 2009, he was reassigned to the general population because he had completed the "Taking a Chance on Change" program.

Hemphill asserts that his Fourteenth Amendment rights were violated. He alleges that his removal from MCIH's general population to administrative segregation and transfer to NBCI's SMU were without notice or hearing. ECF No. 19 ¶ 50. He alleges that he was only told that his SMU

---

[5] Participation in the program was mandatory until April 2008, at which time the QOL guidelines were revised, allowing inmates to opt-out of the program and be placed on administrative segregation instead. ECF No. 29, Ex. 2 at 20, & 23-24.

[6] Hemphill admits that he told an NBCI psychologist that the QOL program was "B.S." and stated "F this program." ECF No. 19 at ¶ 35.

[7] In April 2008, the program was made voluntary. Inmates could opt out of the program and be placed on administrative segregation instead.

and QOL placements were based on security reasons and his identification as a "member or participant in gang activity." *Id.* at ¶¶ 21, 23. He states that most of his property was confiscated and all his privileges revoked upon transfer to NBCI. *Id.* ¶ 38. He alleges that he: (1) was placed on 24-hour cell isolation, (2) was allowed only one hour of recreation a week in three-piece restraints, (3) lost his visits, (4) was unable to work and/or earn diminution credits, (5) was unable to fulfill parole recommendations, and (6) was denied access to the courts. *Id.*

The Defendants contend that Hemphill was told the basis for his placements and given an opportunity to respond at the July 6, 2007 and August 9, 2007 reviews. ECF No. 29. They admit that the SMU and QOL placement processes were not clear, and that several inmates were erroneously assigned to the QOL program.[8] They state that no inmate was required to participate in the QOL program, but concede that inmates who refused remained at the intake level until the program was made voluntary in April 2008. ECF No. 29, Ex. 2.

II.  Analysis

    A.  Standard of Review

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, "the judge's function is not . . . to weigh the evidence and determine the truth

---

[8] Before an inmate was transferred to NBCI's SMU, the transferring institution was required to complete a placement form, which was approved by the regional assistant commissioner and the assistant commissioner for programming. ECF No. 29, Ex. 2 at 5. This process was not followed for approximately 90 inmates transferred on an emergency basis in 2007. *Id.* Forty-two of those inmates were discharged from the SMU and QOL program when NBCI officials determined their placements were not properly supported. *Id.*

of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247-48 (emphasis in original).

The Court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in [its] favor," *Dennis v. Columbia Colleton Med. Ctr., Inc.,* 290 F.3d 639, 645 (4th Cir. 2002), but the Court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial," *Bouchat v. Baltimore Ravens Football Club, Inc.,* 346 F.3d 514, 526 (4th Cir. 2003)(quoting *Drewitt v. Pratt,* 999 F.2d 774, 778-79 (4th Cir. 1993)). In reviewing the motion for summary judgment, Hemphill's evidence "is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 255.

B. Mootness

The Defendants argue that Hemphill's claims are moot because he is no longer assigned to administrative segregation or the QOL program. ECF No. 45. An actual controversy must exist throughout a case's pendency. *See Steffel v. Thompson*, 415 U. S. 452, 459 n.10 (1974). The parties must continue to have a "personal stake in the outcome" of the lawsuit, *Lewis v. Continental Bank Corp.,* 494 U.S. 472, 478 (*quoting Los Angeles v. Lyons,* 461 U.S. 95, 101 (1983)), meaning that throughout the litigation, the plaintiff "must . . . suffer[], or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision. " *Spencer v. Kemna*, 523 U.S. 1, 7 (1998); *Nakell v. Attorney General of North Carolina*, 15 F.3d 319, 322 (4th

Cir. 1994) (quoting *Lewis,* 494 U.S. at 477).

Events after a complaint is filed may moot a request for injunctive relief. *See Calderon v. Moore*, 518 U.S. 149, 150 (1996); *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991). When "on the face of the record it appears that the only concrete interest in the controversy has terminated, reasonable caution is needed to be sure that the mooted litigation is not pressed forward, and unnecessary juridical pronouncements on even constitutional issues [are] obtained." *Lewis,* 494 U.S. at 480. Hemphill's request for injunctive relief was mooted when he was returned to the general population. *See Calderon,* 518 U.S. at 150. However, his claim for damages was not. *See Williams,* 952 F.2d at 823 (prisoner's Eighth Amendment claim for monetary damages not mooted by transfer to facility with superior conditions). An actual controversy still exists for this Court to decide.

    C.    Defendants' Motion for Summary Judgment

        1.    Procedural Due Process Claims

            a.    Administrative Segregation Assignment

Hemphill argues that his Fourteenth Amendment due process rights were violated because he was placed on administrative segregation at MCIH and NBCI without adequate notice or a hearing. ECF No. 19 at ¶ 51. The Fourteenth Amendment protects against deprivations of "life, liberty, or property." U.S. Const. amend. XIV. To determine whether a plaintiff has been deprived of due process, courts ask: (1) whether the state has interfered with a protected interest? and (2) whether sufficient process accompanied that interference? *Wilkinson v. Austin,* 545 U.S. 209, 221 (2005).

Inmates have a liberty interest in avoiding confinement that imposes an "atypical and significant hardship…in relation to the ordinary incidents of prison life." *Sandin v. Connor,* 515

U.S. 472, 484 (1995). Placement on administrative segregation alone is not an "atypical and significant." *See Beverati v. Smith,* 120 F.3d 500, 502-04 (4th Cir. 1997) ("confinement to administrative segregation does not implicate a liberty interest.").

Hemphill has not alleged, nor provided evidence, that his administrative segregation assignment was atypical.[9] He had no liberty interest in avoiding that confinement, and his placement on administrative segregation did not violate the Fourteenth Amendment.[10] The Defendants are entitled to summary judgment on this claim.

          b.     SMU Assignment

Hemphill also argues that his placement in NBCI's SMU and QOL program violated due process. He argues that the SMU and QOL programs were "atypical" compared to other types of segregation because he: (1) was allowed no visitors and only an hour of recreation a week in full restraints, (2) could not work or earn diminution credits, (3) had no human contact, and (4) had "difficulty in obtaining remedy forms." [11] ECF No. 19. He argues that there was "no policy in effect" regarding transfer to NBCI's SMU and contends that he was given insufficient notice of the reasons for his transfer and not provided a formal pre-placement hearing. *Id.* at 11-12.

---

[9] The uncontroverted evidence is that Hemphill was afforded out-of-cell activity and showers while assigned to administrative segregation at NBCI. ECF No. 29, Ex. 1 at 56-72.

[10] Hemphill also had no liberty interest in avoiding transfer from MCIH to NBCI. *See Olim v. Wakinekona,* 461 U.S. 238, 245-46 (1983) ("an inmate has no justifiable expectation that he will be incarcerated in any particular prison.").

[11] In his Amended Complaint, Hemphill also asserts that he was unable to fulfill parole recommendations because of his placement. ECF No. 19 at 14-15. No evidence supports this assertion.

7

Assuming, without deciding, that this shows a protected liberty interest,[12] the second consideration is whether sufficient process accompanied Hemphill's SMU and QOL placements. Three factors are considered in deciding whether the procedures were sufficient: (1) the nature of the private interest affected, (2) the risk of erroneous deprivation through the procedures used, and the probable value, if any, of additional procedural safeguards, and (3) the Government's interest, including the function involved and the fiscal and administrative burdens of additional or substitute procedural requirements. *Wilkinson,* 545 U.S. at 224-25 (*citing Mathews v. Eldridge,* 424 U.S. 319, 335 (1976)).

As to the first factor, Hemphill's interests "must be evaluated …within the context of the prison system and its attendant curtailment of liberties." *Id.* at 225. Inmates are not entitled to the process due persons at liberty; "prisoners held in lawful confinement have their liberty curtailed by definition, so the procedural protections to which they are entitled are more limited than in cases where the right at stake is the right to be free from confinement at all." *Id.* (*citing Gerstein v. Pugh,* 420 U.S. 103 (1975)). Hemphill was not entitled to an adversarial hearing, witnesses, evidence introduction, or other features of a full trial to support his placement. *See, e.g., Howard v. Werlinger,* 2010 WL 5027169, at *1 (3d Cir. Dec. 10, 2010) ("The prison administration is not required to allow a prisoner to cross-examine and confront witnesses in a disciplinary hearing and

---

[12] *See Wilkinson,* 545 U.S. at 244 (conditions in maximum security prison were atypical and significant when: (1) inmates lived in solitary confinement, (2) were exposed to light 24 hours a day, (3) were limited to one hour of daily indoor exercise, (4) the potential duration of placement was indefinite, and (5) the placement disqualified inmates for parole consideration); *Farmer v. Kavanaugh,* 494 F. Supp. 2d 345, 356 (D. Md. 2007) ("the conclusion in *Wilkinson* that general conditions of solitary confinement, along with lack of time limits on placement and categorical ineligibility for parole, give rise to a protected liberty interest does not mean that essentially the same conditions accompanied by a lack of time limits…and…adverse impacts on parole

has the discretion to limit the hearing and the witnesses called to protect institutional security.").

The second factor addresses the risk that Hemphill was erroneously assigned to the SMU and QOL program under the procedures used, and the probable value of any additional procedures. Notice and an opportunity to rebut the basis for his placement are "the most important procedural mechanisms for purposes of avoiding [an] erroneous deprivation[]." *Id.* at 225-26. The undisputed evidence is that Hemphill: (1) was a validated BGF member, ordered hits on other inmates, and had many institutional infractions,[13] (2) received notice and an opportunity to rebut the basis for his placement at the August 9, 2007 review, and (3) declined to attend his monthly reviews thereafter. ECF No. 58; ECF No. 29, Ex. 2 at 10-18.

The notice of assignment, initial August 9, 2007 placement review, and the monthly reviews—which Hemphill could have attended to be heard—were sufficient to protect him from erroneous placement. *See Wilkinson,* 545 U.S. 216-17 (due process satisfied when inmates (1) were given brief factual basis for placement before initial hearing, (2) had opportunity to be heard at placement hearing and annual placement review, and (3) could appeal decisions).

Under the third factor, any additional steps DOC officials could have taken to prevent an erroneous initial placement are outweighed by their obligation "to ensure the safety of guards and prison personnel, the public, and the prisoners themselves." *Wilkinson,* 545 U.S. at 227. The undisputed evidence is that the QOL program began in 2007 in response to several incidents of gang violence at DOC facilities. ECF No. 29, Ex. 2 at pg. 5. Inmates were transferred into the program on an emergency basis. *Id.* Several inmates were processed out of the program when officials

---

eligibility…do not establish [a protected] interest.").
[13] Because of its sensitive nature, the Defendants filed this evidence under seal. ECF No. 58.

discovered that their placements were not sufficiently supported; Hemphill was not processed out because his placement was properly supported. ECF No. 58.

There is no genuine dispute whether Hemphill was afforded adequate process for his SMU and QOL placements. The Defendants' motion for summary judgment will be granted on this claim.

2. Equal Protection Claim

Hemphill argues that his Fourteenth Amendment right to equal protection was violated because he was "subject[ed] . . . to the Quality of Life Program [which] deprived [him] of procedural protections, inmate rights, and privileges that other prisoners enjoy[ed]." ECF No. 19 at ¶ 59.

"The Equal Protection Clause requires the government to treat similarly situated people alike." *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439 (1985). To show that his equal protection rights were violated, Hemphill must demonstrate that: (1) he was treated differently than similarly situated inmates, and (2) the discrimination was intentional or purposeful. *Williams v. Bitner,* 307 Fed. Appx. 609, 611 (3d Cir. 2009); *Brooks v. Berkebile,* 2010 WL 3521581, at *5 (S.D. W. Va. Aug. 16, 2010). If the discrimination was based on Hemphill's membership in a suspect class, the differential treatment must be narrowly tailored to a compelling governmental interest; otherwise, Hemphill must show that the discrimination did not bear a rational relationship to a legitimate government purpose. *See Cleburne,* 473 U.S. at 440-42.

Viewing the facts in the light most favorable to Hemphill, he presents no genuine dispute whether the denial of his privileges violated equal protection. *Dennis,* 290 F.3d at 645. Hemphill has presented no evidence that his SMU and QOL placements were based on a suspect classification. Rather, the undisputed evidence is that he was placed in the program because of his gang

involvement. ECF No. 58. The program was designed to "provide safety and security to the staff and inmates throughout the Division of Corrections" and to "reduce risky behavior." ECF No. 29, Ex. 3 at 5. This is a legitimate government purpose. *See Overton v. Bazzetta,* 539 U.S. 126, 133 (2003) (internal prison security is perhaps the most legitimate of penological goals). Curtailment of visitation, recreation, and property privileges, which emphasizes the connection between an inmate's "choices and consequences," is rationally related to providing a safer prison environment. ECF No. 29, Ex. 3 at 7; *Overton,* 539 U.S. at 133. The Defendants are entitled to summary judgment on Hemphill's equal protection claim.

        3.        Maryland APA Claim

Hemphill also argues that Defendants Stouffer and Maynard failed to comply with Maryland's APA in implementing QOL program regulations. ECF No. 19 at ¶¶ 43, 57.[14] Having determined that summary judgment is appropriate on Hemphill's federal claims, this Court declines to exercise its supplemental jurisdiction over his state law claim. *See* 28 U.S.C. § 1367 (c) (3); *Shanaghan v. Cahill,* 58 F.3d 106, 110 (4th Cir. 1995). That claim will be dismissed without prejudice.

III.    Conclusion

For the reasons stated above, the Defendants' supplemental motion to dismiss or for summary judgment will be granted as to Hemphill's Fourteenth Amendment claims.

Date: <u>January 21, 2011</u>                                           /s/
                                                                                   William D. Quarles, Jr.
                                                                                   United States District Judge

---

[14] Hemphill has included some of the allegations stating this claim with his equal protection allegations. The Court construes this claim as separate from the equal protection claim.